**EXHIBIT 1**

# JOINT VENTURE AGREEMENT

THIS JOINT VENTURE AGREEMENT is made and entered into this 7th day of April, 2022 by and between Kiewit Infrastructure South, Co. (hereinafter "Kiewit") and Sundt Construction, Inc. (hereinafter "Sundt").

*RECITALS:*

WHEREAS, EPCOR Services, Inc. (hereinafter "EPCOR") has advertised for proposals for the construction of an industrial wastewater treatment facility in or near Taylor, Texas currently referred to as "Project Drake" ("Project") which proposals are to be submitted on or about March 25, 2022, and;

WHEREAS, the parties hereto have agreed to form a Joint Venture to submit a joint proposal for and, if possible, to obtain a contract with EPCOR for such construction (hereinafter "Construction Contract"), and;

WHEREAS, the parties desire to enter into a Joint Venture Agreement in order to fix and define between themselves their respective rights, obligations, interests and liabilities in connection with the submission of such proposals and the performance of such Construction Contract in the event that it is awarded to them.

NOW THEREFORE, in consideration of the mutual promises and agreements set forth herein, the parties agree to constitute themselves as joint venturers for the purpose of submitting a proposal to EPCOR for the performance of the Construction Contract described above and for the purpose of performing and completing such Construction Contract in the event that it is awarded to them on such joint proposal, and the parties hereby agree that such proposal shall be submitted and such construction, if awarded to them, shall be performed and completed by them as a joint venture subject to the following terms and conditions.

## 1. NAME AND SCOPE OF JOINT VENTURE

1.1 The proposal shall be filed and the Construction Contract, if awarded to the parties hereto, shall be entered into in the names of the parties as joint venturers, and the obligations of the parties under such proposal and Construction Contract shall be joint and several and shall include all changes and modifications to the Construction Contract. The Construction Contract, if awarded to the parties hereto based on their joint proposal, shall be carried out and performed by them in the name of Sundt/Kiewit, A Joint Venture (hereinafter "Joint Venture") and all money, equipment, materials, supplies and other property acquired by the Joint Venture shall be held jointly in that name.

1.2 No payment shall be made by the Joint Venture to any of the parties hereto in reimbursement of expenses incurred by such parties in connection with the preparation of the proposal response for the securing the award of the Construction Contract, unless otherwise agreed to in writing.

1.3 It is the intent of the parties hereto that the joint proposal response contemplated by this Joint Venture Agreement shall be satisfactory and acceptable to both parties in their respective sole discretion. If the parties are unable to agree upon a joint proposal response, this Joint Venture shall terminate upon written notice by the dissenting party to the other party or parties, which written notice shall be delivered to the other party or parties prior to the time of the proposal response and, in such event no party shall have any liability to any other party or parties.

1.4 This Joint Venture Agreement shall not be interpreted or construed so as to extend beyond the submission of such joint proposal and the performance of such Construction Contract, nor to create any permanent partnership or permanent Joint Venture between the parties and shall not limit any of the parties in their right to carry on their individual businesses for their own benefit, including other work for EPCOR.

2. PROPORTIONATE SHARES

2.1 Except as otherwise provided in Paragraphs 4.2 and 4.3 hereof, the interest of the parties in any profits and assets and their respective shares in any losses and liabilities that may result from the filing of such joint proposal and/or the performance of such Construction Contract, shall be as follows.

| | |
|---|---|
| Kiewit Infrastructure South, Co. | [redacted]% |
| Sundt Construction, Inc. | [redacted]% |

such percentages being referred to hereinafter as the respective party's Proportionate Share.

2.2 It is the intention of this Joint Venture Agreement, and the parties hereby agree that in the event of any losses arising out of, or resulting from the performance of said Construction Contract, each party hereto shall assume and pay its Proportionate Share of such losses. If for any reason any one of the parties sustains any liabilities or is required to pay any losses arising out of or directly connected with the performance of such Construction Contract, or the execution of any surety bonds or indemnity agreements in connection therewith, which are in excess of its Proportionate Share in the losses of the Joint Venture, the other party or parties shall reimburse such party in such amount or amounts as the losses paid and liabilities assumed by such party exceed its Proportionate Share in the total losses of the Joint Venture, so that each member of the Joint Venture will then have paid its Proportionate Share of such losses; and to that end each of the parties hereto agrees to indemnify the other party or parties against and to hold it harmless from any and all losses, costs and expenses (including reasonable attorney fees) of the Joint Venture that are in excess of such party's Proportionate Share. Provided, however, that the provisions of this subparagraph shall be limited to losses, costs and expenses (including reasonable attorney fees) that are directly connected with or arise out of the performance of said Construction Contract and the execution of any bonds or indemnity agreements in connection therewith, and shall not relate to or include any speculative, prospective, incidental or indirect consequential losses that may be sustained or suffered by any of the parties.

2.3 The parties shall, from time to time, execute such applications for bonds and

indemnity agreements, and other documents and papers as may be necessary in connection with the submission of a joint proposal for the performance of the Construction Contract.

2.4. If any of the parties is a subsidiary of another corporation, the performance by such subsidiary of the obligations assumed hereunder shall be guaranteed by a parent corporation of such subsidiary pursuant to the terms of a mutually acceptable parent guarantee.

3. <u>MANAGEMENT OF JOINT VENTURE; DISPUTE RESOLUTION</u>

3.1 Authority to act for and bind the parties to the Joint Venture in connection with all or any part of the performance of the Construction Contract shall be vested in the Management Committee, which may, from time to time, delegate all or any part of such authority to one of the parties and/or to any individual or individuals upon unanimous consent of the parties. Neither the Management Committee nor any party hereto shall have the authority to act for or bind the other party(ies) except in connection with the performance of the Construction Contract. Except as provided in Paragraphs 4.2 and 4.3, each party shall have a voice in the Management Committee equal to its Proportionate Share. The parties hereby designate the following individuals to represent them on the Management Committee:

Kiewit Infrastructure South, Co. [redacted]

Sundt Construction, Inc.

Such designations may be changed by any party at any time upon written notice to the other parties by the Management Committee Representative of such party, but until such notice and new appointment, the actions of the representatives hereby appointed shall be conclusively binding on the party appointing them.

3.2 Kiewit is hereby designated as the Managing Party of all administrative aspects of the Joint Venture, subject, however, to the superior authority and control of the Management Committee. Sundt is hereby designated as the lead for all client management (EPCOR) duties and engineering (Stantec) relationships.

Kiewit and Sundt each agree that neither of them shall receive a management fee for their management services on behalf of the Joint Venture . .

General and Administration Fee. The Parties will charge the Joint Venture a home office G&A fee based on their respective Proportionate Share of profits. The home office G&A fee will be equal to [redacted] as defined in Section 5.2 and will be applicable to all Work for the entire duration of the Project ("the G&A").

a. The G&A will be charged to the Joint Venture on a monthly basis and paid to the Parties as follows:

(i) If the Joint Venture has sufficient cash to pay the G&A, the Joint Venture will pay each Party its proportionate share of G&A equal to its Proportionate Share of the profits;

(ii) If the Joint Venture has insufficient cash to pay the G&A, the Management Committee may require: (x) the Parties to contribute the percentage of cash that is equal to its Proportionate Share of profits sufficient to reimburse each Party for its respective share of G&A; or (y) contribute the G&A for that month to the Joint Venture in lieu of receiving cash. This will result in the increase in each Parties capital account by the amount equal to their respective share of G&A; or (z) the G&A will remain unpaid for the month and accrue as an obligation of the Joint Venture, provided however, the Joint Venture will pay any unpaid G&A no later than the end of each calendar year even if such requires the Parties to contribute the percentage of cash equal to their Proportionate Share of the profits sufficient to reimburse each Party for its respective share of G&A.

(iii) The amount of the G&A fee charged to the project will be calculated as [redacted]

3.3 Any delegation of authority to any individual or party may be revoked by majority vote of all the parties; provided, however, that if the authority of the individual serving as Project Manager is revoked, the Managing Party shall have the right and obligation to appoint another individual to serve in that capacity who is reasonably acceptable to the parties hereto.

3.4 Decisions (or, at their option, the establishment of Guidelines to be followed by the Managing Party) regarding the following matters shall be made upon the unanimous vote of the Management Committee:

a. Significant financial matters such as borrowing, debt guarantees, lease commitments and the investment policy with respect to Joint Venture funds.

b. Approval of the cost accounting and management information system that will be utilized for the project to provide cost data, scheduling and projected outcome of the project.

c. The sale of Joint Venture assets, including the terms of such sale and the agent therefore, if any.

d. Settlements, in excess of a threshold amount set by the Management Committee, of claims or litigation by or against the Joint Venture.

e. Transactions between any joint venturer and the Joint Venture, including agreements, if any, concerning the use of and rates of payment or reimbursement for loans of Joint Venture funds, employees, equipment, temporary or permanent materials, management personnel, data processing and/or other services.

f. the entering into of any agreement or the making of any offer or the granting of any right capable of becoming an agreement to permit any other person to become a Party to the Joint Venture;

g. the reorganization or arrangement of the debts or the business or affairs of the Joint

Venture under any bankruptcy, insolvency or debtor relief legislation;

h. the taking of any proceedings with the express intent to begin the winding up or termination of the Joint Venture other than as expressly contemplated by this Agreement;

i. any alteration to or amendment of this Agreement;

j. any change in the accounting policies to be followed by the Joint Venture, except as required by the applicable accounting rules;

k. the provision of any loan, guarantee or similar financial assistance by the Joint Venture to any Party or any Affiliate of any Party;

l. any borrowings by the Joint Venture or pledge the credit of the Joint Venture;

m. Internal equipment or labor rental rates charged to the Joint Venture by any Party or an Affiliate of any Party, or sales values of any property exchanged (bought/sold) between the Joint Venture and any Party or an Affiliate of any Party;

n. Change Orders in excess of $1,000,000 and any change orders modifying any of the Agreement Milestone Dates or the Completion Deadlines;

o. commencement and major strategy decisions relating to all claims, disputes and lawsuits of any kind between the Joint Venture and the Owner, subcontractors suppliers and other third parties where the value alleged exceeds $100,000 and to authorize negotiation, arbitration, litigation and/or any other process for their resolution and to authorize the settlement thereof;

p. the selection of subcontractors where the proposed value of the subcontract exceeds $1,000,000 and

q. the decision to grant a contract or subcontract for services to or purchase any materials from any Party or any Affiliate of any Party not expressly contemplated by this Agreement where the proposed value of a single award is more than $1,000,000 or the aggregate of awards to a Party or any Affiliate of that Party (considered collectively) exceeds $2,500,000;

r. Creation of any charge, assignment, mortgage, pledge, hypothecation or other encumbrance upon the assets or business of the Joint Venture;

s. the amount, timing and terms of any distributions of Joint Venture assets or other property to any Party or affiliate of any Party;

t. Time, place and frequency of Management Committee meetings and to establish the policies of the Joint Venture;

u. Approval of expenses related to travel/entertainment allowance in excess of $2,500 for a single event

3.5 Tax Matters Authority.

(a) The Joint Venture will be classified as a partnership for income tax purposes and the Parties will not take any action contrary to that classification.

(b) For federal income and other tax purposes, the Managing Party:

(i) Is designated the "Partnership Representative" pursuant to Internal Revenue Code § 6223, as amended by the Bipartisan Budget Act of 2015 (the "**Budget Act**"), and the "tax matters partner" for periods beginning prior to January 1, 2018;

(ii) Shall cause the Joint Venture, if eligible, to make an election not to be subject

to the partnership level audit proceedings pursuant to Internal Revenue Code § 6221(b), as amended by the Budget Act. If the Joint Venture is not eligible to make such an election, the Partnership Representative is hereby authorized to make the election pursuant to Internal Revenue § 6226(a) to have the Parties take tax adjustments into account on their own tax returns. The Partnership Representative shall not take any action or fail to take any action under Internal Revenue Code § 6225(c) without the prior written consent of a Party who would be adversely affected by such action or inaction which consent shall not be unreasonably withheld, conditioned or delayed. The Partnership Representative shall not take any action that would require a Party to file an amended return pursuant to Internal Revenue Code § 6225(c)(2)(A) without the prior written consent of such Party. The Parties agree to cooperate and provide all information reasonably requested by the Partnership Representative in connection with a partnership level audit of the Joint Venture, and to indemnify and hold harmless the Joint Venture and Partnership Representative for any liability with respect to such Party's proportionate share of tax liability (including related interest and penalty) imposed on the Joint Venture as a result of partnership level tax audit;

(iii) Has exclusive jurisdiction for all matters relevant to the determination of the Joint Venture's federal, state, municipal or other tax matters including, without limitation, the rate at which depreciation is claimed, whether or not non-mandatory returns or elections are made or filed, and the allocation of taxable income, losses and other relevant items for tax purposes, which will be done in a manner consistent with the economic arrangements of the Parties pursuant to this Joint Venture Agreement and consistent with Treasury Regulation § 1.704-1(b)(3) as reasonably determined by the Managing Party;

(iv) Will exercise its discretion with regard to tax matters in a manner to ensure that the taxable income allocated will be as low as possible, unless otherwise agreed upon by the Policy Committee;

(v) Is responsible for the timely registration, filing of returns, and payment of all sales, use, transaction privilege, gross receipts, and excise taxes for which the Joint Venture is liable;

(vi) Has exclusive jurisdiction with respect to the handling or response to any audit or inquiry by a government authority relating to the tax affairs of the Joint Venture or with respect to any objections or appeals to be brought on behalf of the Joint Venture or any such matter which involves the Joint Venture in any way (as to those matters which involve the Joint Venture); and

(vii) Will keep the other Party informed of any audits, inquiries, objections or appeals relating to the tax affairs of the Joint Venture.

(c) The fiscal year-end of the Joint Venture will occur on the last Saturday of December unless a different year-end is required pursuant to Internal Revenue Code § 706 and the Treasury Regulations promulgated thereunder.

3.6 Texas Franchise (Margins) Tax.

(a) To the extent Kiewit (or an affiliate of Kiewit) is required to report the Joint Venture activities (including Sundt's allocable share of Profits or Losses) in a combined Texas Franchise Tax Return ("Texas Tax Return"), Kiewit (or an affiliate of Kiewit) shall be responsible for the payment of tax related to such return. The Managing Party shall prepare a "Combined Pro-Forma Texas Franchise Tax" to determine the amount, if any, billable by Kiewit (or an affiliate of Kiewit) to the Joint Venture for the Texas Franchise Tax of the Joint Venture reported on the Texas Tax Return. The Combined Pro-Forma Texas Franchise Tax shall be the Texas Franchise Tax computed on the activities of this Joint Venture and any other partnership, joint venture or other business form included in the Texas Tax Return that has as members, only Parties (or an affiliate of the Parties) of this Joint Venture and where each of the Parties (including their affiliates) have the same total Proportionate Share as in this Joint Venture. The computation of the Combined Pro-Forma Texas Franchise Tax shall be in accordance with the laws, rules and regulations for the given tax year as applied by the Managing Party.

(b) The Managing Party shall compute estimated, extension and return payment amounts with respect to the Combined Pro-Forma Texas Franchise Tax for inclusion in the Texas Tax Return filings. Kiewit (or an affiliate of Kiewit) shall then bill the Joint Venture for the Combined Pro-Forma Texas Franchise Tax. Reimbursement to Kiewit (or an affiliate of Kiewit), or refunds of overpayments due to the Joint Venture, shall be made within 10 days of notification.

(c) If a governmental authority upon audit, notice or other final determination makes an adjustment that impacts the Combined Pro-Forma Texas Franchise Tax as previously computed, the Managing Party shall recompute the Combined Pro-Forma Texas Franchise Tax. The Managing Party shall then notify the Joint Venture of any tax due or overpayment in accordance with the above.

(d) The Managing Party will provide to the Joint Venture documentation supporting the calculation of the Combined Pro-Forma Texas Franchise Tax billed or credited.

(e) The provisions of this section shall survive the liquidation, termination or dissolution of the Joint Venture.

3.7 Management Committee meetings shall be held as needed, but in no event less frequently than once every three months. Job progress reports, a recently updated construction schedule, and the most recent copies of the financial reports described in Paragraph 5.2 shall be presented and reviewed by the parties at such meetings. Any other matters of interest to the Joint Venture may be investigated at, or as a result of, such meetings. Any party may, upon written

notice fifteen (15) days in advance of same, call a special meeting of the Management Committee.

3.8 Notwithstanding the provisions of Paragraph 3.9, if any dispute between the parties affects or threatens the orderly or timely progress of the Work, the Joint Venture shall proceed with the Work as directed by the Managing Party in writing. The Managing Party shall provide a copy of written directives to the other party at the time the written directive is made. The Managing Party's decision with respect to matters affecting the prosecution of the Work shall be final and binding unless an objecting party provides written notice of its objections within twenty (20) days after receipt of the Managing Party's written directive. In no event shall any dispute be permitted to delay the progress of the Work.

3.9 In the event of any dispute, including those which have been the subject of a formal objection pursuant to paragraph 3.7, the parties shall exhaust every reasonable effort to amicably settle or resolve the dispute. If, after the Senior Officers of the parties have met on no less than two separate occasions in an attempt to settle or dispose of such dispute, then such dispute shall be resolved by binding arbitration in accordance with the then current International Institute for Conflict Prevention and Resolution (CPR) Rules for Non Administered Arbitration, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The dispute shall be heard and determined by one arbitrator who shall be a practicing attorney specializing in construction law. If the parties cannot timely agree on a single arbitrator or if, despite repeated requests from one party the other party fails or refuses to meaningfully participate in the arbitration proceeding, then either party may request CPR in writing, with copy to the other party, to select the arbitrator required to complete the tribunal pursuant to Rule 6 of the CPR Rules for Non Administered Arbitration. A hearing on the dispute shall be conducted as promptly as practicable. The arbitration shall take place in Travis County, Texas.

## 4. CAPITAL CONTRIBUTIONS AND DEFAULT

4.1 The Management Committee shall from time to time determine the amount of the working capital required to perform the Construction Contract and each party shall contribute its Proportionate Share of such working capital whenever requested to do so. Such contributions shall be made within ten (10) days after request. If any party borrows funds to meet any of its obligations hereunder, such borrowing shall be the sole and separate obligation of that party and shall not be the debt or obligation of the Joint Venture.

4.2 If any party fails or is unable to provide its Proportionate Share of the funds required by the Joint Venture, the interest of said party in the return of investment and profits of the Joint Venture shall be decreased to the proportion that the amount actually provided by it bears to the total amount of the funds provided by all parties, and the interest of any party which may have contributed more than its Proportionate Share of such funds shall be increased in the same proportion. Notwithstanding the foregoing, nothing shall increase or decrease the proportionate liability of the parties for losses suffered or sustained by the Joint Venture absent written agreement of the parties. The amount unpaid, plus simple interest which shall be charged at the rate per year of three percent (3%) above the prime rate of interest charged by JP Morgan Chase Bank N.A. (but not exceeding the maximum allowed by law), shall continue to be a charge against the defaulting party until repayment. It is understood that the subsequent payment of working capital in arrears by any

party hereto, which has failed or refused or was unable to contribute its appropriate share of the working capital and funds, shall not cure the default of such party, except by the express written consent of the other party.

Reduction in a defaulting party's share of the profits and increases in the share of the other party's shall be calculated as of the time of each default in contributions and as of the time of excess contributions by other parties. The profit shares so as adjusted may be further adjusted to reflect any subsequent default or excess contributions.

The defaulting party shall have no representative on the Management Committee and shall have no right to participate in the affairs of the Joint Venture until either (1) all of the defaulted contributions and default interest have been paid to the Joint Venture or (2) distributions to the nondefaulting parties have included repayment of all of the excess contributions and payment of all default interest.

4.3 If any party shall dissolve, become bankrupt, or shall file a voluntary petition in bankruptcy, the remaining party or parties shall do all things necessary to wind up the affairs of this Joint Venture, including the completion of the Construction Contract, the collection of all monies and property due to the Joint Venture, the payment of all debts and liabilities of the Joint Venture, and the distribution of its assets. Such dissolved or bankrupt party shall have no further voice in the performance of the Construction Contract or in the management of the Joint Venture, nor shall any trustee, legal representative, or successor of any type. The participation of such dissolved or bankrupt party, or its representative, in the profits of the Joint Venture shall be limited to that Net Proportion (Contributions of the defaulting party less default interest charges) which the contributions of such party to the working capital of the Joint Venture bears to the total contributions to such working capital made by all of the parties, but such dissolved or bankrupt party and its representatives shall be charged with and shall be liable for its full share, as fixed in Section 2 above, of any and all losses that may be suffered by the Joint Venture under the Construction Contract, including any additions, amendments or modifications thereof.

## 5. BANKING AND ACCOUNTING

5.1 All contributions of working capital made by the parties hereto, and all other funds received by the Joint Venture in connection with the performance of the Construction Contract, shall be deposited in such bank or banks as the Management Committee may designate in separate bank account(s) bearing the name of this Joint Venture. Withdrawals of such funds may be made in such form and by such persons as the Management Committee may from time to time direct. All persons authorized to draw against the funds of the Joint Venture shall be bonded in such company or companies and in such amounts as the Management Committee shall determine.

5.2 Separate books of account of the transactions of the Joint Venture shall be kept in accordance with generally accepted accounting principles. Such books, and all records of the Joint Venture, shall be available for inspection by any party at any reasonable time. Periodic audits shall be made of such books at such times and by such persons as the parties may direct at the expense of the requesting party, a certified annual audit may be requested by either party, at the expense of the requesting party and copies of the audit reports shall be furnished to each party. Financial

statements and cost reports shall be prepared and provided to each party with profits on the Construction Contract reported on a Percentage-of-Completion method within 25 days after the end of each calendar month; and within 30 days after the end of each fiscal year. No less frequently than every three (3) months forecasts of cash flow, final contract revenue, cost and profit and reports setting forth the status of change requests, shall be prepared and copies furnished to each party. Upon completion of the Construction Contract, a final audit may be conducted at the request of either party and at the cost of the requesting party and copies of such audit report shall be furnished to each of the parties.

Tax Reports. On or before the 1st day of the 3rd month after each fiscal year, a projection of taxable income attributable to each Party and on or before the 15th day of the 7th month after each fiscal year, federal and state income tax returns and other accounting, tax information and schedules as are required by the Parties for the timely and accurate completion of their tax returns.

For purposes of this Joint Venture Agreement, and unless specified to the contrary in the Construction Contract, costs of construction shall include the costs of all subcontracts, labor, materials, services, supplies, plant and equipment purchased or rented, bonds, insurance, taxes on labor and material, property taxes on equipment owned, permits, customs, duties, legal fees, accounting fees, liabilities and losses not covered or compensated by insurance or otherwise and any and all other expenses and obligations incurred or suffered in and about the performance of the Construction Contract of a nature which, under generally accepted accounting principles, are chargeable as a cost of the performance of the work. Travel expenses and subsistence during travel reasonably incurred which is related to the performance of the work of the Construction Contract shall be treated as part of the cost of the work and shall be paid with Joint Venture funds if such type of travel was authorized and approved by the Management Committee prior to incurring said expenses.

Upon completion of the Construction Contract, a true and correct accounting shall be made of all income, expenses, accounts, vouchers, records, and financial data relating to its performance.

To the extent that said records are required to be kept after completion of the Construction Contract, the same shall be kept at such place as the Management Committee may, from time to time, determine, and the cost thereof shall be borne by the Joint Venture.

5.3 None of the parties shall make any charges against the Joint Venture for time which may be expended in connection with performing the Construction Contract by either party, its officers or employees, except for (1) those officers or employees who are directly employed by the Joint Venture; (2) any home office services which have been previously approved and agreed to by the parties including but not limited to home office overhead expenses; and (3) the Fixed Percentage Fee payable to the Managing Party.

5.4 Any interim disbursement of Joint Venture funds to any of the parties other than repayment of contributed capital shall constitute a loan and an unconditional and legally enforceable obligation to repay such sum with interest, if applicable, to the Joint Venture within thirty (30) days after demand or prior to dissolution of the parties, whichever occurs first. Any such loan which is not repaid shall be deducted, together with applicable interest, from the distributive share of the borrowing party. Each such loan(s) shall be evidenced by a properly executed note(s) for the

amount(s) disbursed and shall bear whatever interest is agreed to by the borrowing party and the Joint Venture at the time the loan is made.

5.5 All rentals or leases of property, plant, and equipment (rolling stock equipment or other) to the Joint Venture by either Party or an Affiliate of either Party, may be terminated by either the Joint Venture (lessee), or the Party or Affiliate of either Party (lessor), in whole or in part, upon no more than 30 days' notice without penalty.

6. MISCELLANEOUS

6.1 The parties may determine from time to time during the course of this Joint Venture Agreement that some of the assets held and acquired by the Joint Venture may be divided among or paid to the parties in accordance with their Proportionate Shares. Upon the completion of the Construction Contract, the assets held and acquired by the Joint Venture shall be divided between the parties and the profits or losses accrued in the performance of the Construction Contract shall be divided between or paid by the parties, as the case may be, in accordance with the terms of this Joint Venture Agreement, and this Joint Venture Agreement shall then terminate; provided, however, in the event there are known unresolved claims at such time, an adequate reserve amount shall be established by the Management Committee and held by the Joint Venture until said claim(s) is/are resolved. If claims of any nature or legal action of any type are brought against the Joint Venture or any of the parties at any time after such distribution by any third party or parties not signatory to this Joint Venture Agreement and such claims and/or legal action relate to or arise out of this Joint Venture Agreement, the performance of the Construction Contract and/or the work product thereof, this Joint Venture Agreement shall be considered to have remained in full force and effect and the rights and obligations of the parties hereto with respect to such matters shall be determined by this Joint Venture, notwithstanding the passage of time.

6.2 No party hereto shall sell, assign or in any manner transfer its interest in the Joint Venture without first obtaining the written consent of the other party(ies). Neither this Joint Venture Agreement nor any interest of the parties, including interest in any moneys belonging to or which may accrue to the Joint Venture in connection with the Construction Contract or any interest in the joint accounts or in any property of any kind employed or used in connection with the Construction Contract, may be assigned, pledged, transferred or hypothecated, except that in the event any party hereto desires to obtain banking accommodations for the purpose of meeting its obligations under this Joint Venture Agreement and the Construction Contract such party may, with the prior written consent of the other party, assign, pledge, or hypothecate its right, title and interest in and to the moneys it may be entitled to receive hereunder as security for said banking accommodation.

The right of any person, firm or corporation claiming by, through or under any party hereto (including but not limiting the same to judgment or other creditors, receivers, trustees assignees, garnishees, executors, or administrators) to assert to any claim against the right, title and interest of any party hereto, shall be limited solely to the right to claim or receive, after completion of the Construction Contract and after the closing of the accounts of the parties, the distributive share of such party in the proceeds payable hereunder.

6.3 The Management Committee shall determine the appropriate insurance coverages and limits to be provided by the Joint Venture and by each Party to the Joint Venture to meet the requirements of the Construction Contract and protect the Joint Venture as defined in Exhibit B. The Joint Venture and/or each party shall execute such agreements as may be required to obtain the appropriate insurance. Each Party agrees to waive subrogation against each other, and the Joint Venture under the General Liability or Excess Liability, or for their separate property, contractor's equipment, computer, valuable papers, and automobile liability/physical damage coverages maintained by each party. If the Project is covered by a Contractor Controlled Insurance Program (CCIP) or Owner Controlled Insurance Program (OCIP), each Party also agrees to waive subrogation against all tiers of subcontractors enrolled in the CCIP or OCIP, respectively.

The cost of the premiums for all insurance procured by or for the benefit of the Joint Venture shall be considered as a cost of the work, unless otherwise addressed herein. Losses in excess of the limits available will have each party assume its proportional share of any loss exceeding these limits in their own respective excess liability programs. Uninsured losses or losses arising from the failure to procure such insurance shall be the responsibility of the party which failed to procure such insurance and shall not be charged to the Joint Venture. In the event responsibility cannot be apportioned, each party shall bear its proportional share of such loss subject to Paragraph 2.1 of this agreement.

6.4 This Joint Venture Agreement shall be construed and governed by the laws of the State of Texas.

6.5 No waiver by a party of any default of another party in the performance of any provision, condition or requirement herein shall be deemed to be a waiver of, or in any manner release another party from the performance of any provision, condition or requirement herein, nor shall it be a waiver of, or in any manner release another party from the performance of any provision, condition or requirement in the future; nor shall the delay or omission of any party to exercise any right hereunder in any manner impair the exercise of any such right or any like right accruing to it thereafter.

6.6 If any provision of this Joint Venture Agreement shall be judicially determined to be void or unenforceable, such determination shall not affect any other provision of this Joint Venture Agreement, but all other provisions of this Joint Venture Agreement shall remain in force and effect as if such void or unenforceable provision had not been included. If any provision of this Joint Venture Agreement is subject to two or more constructions, only one of which would render the provision valid, then that provision shall be given the meaning which will render the same valid.

6.7 Subject to the foregoing provisions herein, contained, this Joint Venture Agreement shall inure to the benefit of, and be binding upon the parties hereto, their successors, assigns, trustees, receivers, and legal representatives, but shall not inure to the benefit of any other person, firm or corporation.

6.8 To the extent required by licensing authorities having jurisdiction (if any) over the project site, the parties shall maintain throughout the period of this Joint Venture, any required individual, corporate or joint venture license(s) in current, active and good standing status.

6.9 Sundt/Kiewit may intend to allow exclusive, independent contracting with either party's affiliates, including but not limited to Mass Electric Construction Co., on an arms-length basis. Such contracts will be authorized, reviewed and approved through the Management Committee and only upon Management Committee approval, not be considered to be part of a partners Joint Venture participation.

6.10 The Management Committee shall from time to time determine the amount of management personnel (salaried employees) required to perform the Construction Contract and each party shall contribute its Proportionate Share of such personnel whenever requested to do so. The Parties will contribute personnel with relevant experience and expertise in projects of similar size, scope and/or complexity to the Project awarded under this Joint Venture Agreement. The full component of personnel assigned to administer this Project will consist of approximately 51-65% Kiewit salaried employees and 35-49% Sundt salaried employees, allocated across the pre-construction, construction, and Contractor quality control teams as applicable to best utilize the experience, expertise, and specific capabilities of each employee. Personnel performing Design Management services and/or any Work performed by either party's affiliates under Section 6.10 are not considered to be part of a partners Proportionate Share of full-time employees. Personnel assigned to the Project by either Party cannot be reassigned without the approval of the Management Committee, which will not be unreasonably withheld.

6.11 The following Exhibits are included as part of this Agreement:
(a) Exhibit A – Joint Venture Special Provision Items
(b) Exhibit B – Insurance Program
(c) Exhibit C – Joint Venture Sponsor Division of Services and Costs
(d) Exhibit D – Attached and Incorporated Schedules

IN WITNESS WHEREOF, the parties have caused this Joint Venture Agreement to be executed by their duly authorized officers or agents on the date first written above.

Reviewed
Legal

KIEWIT INFRASTRUCTURE SOUTH, CO.

By: ______________________
Printed Name: Terry Carlsgaard
Title: Senior Vice President

ATTEST: ______________________

SUNDT CONSTRUCTION, INC.

By: ______________________
Printed Name: G. Michael Hoover
Title: President and CEO

ATTEST: ______________________